## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| United States of America,<br><br>     Plaintiff,<br><br>       v.<br><br>Jose Vasquez,<br><br>     Defendant. | No. 3:15-cr-00119 (MPS) |

### RULING ON MOTION TO SUPPRESS

Early on the morning of July 15, 2015, police officers with an arrest warrant for Jose Vasquez knocked on the door to his apartment and announced their presence and purpose. After a short wait, they broke through the door, entered, and found Mr. Vasquez and his wife in bed. While assisting Mr. Vazquez to dress, the police saw heroin and cash fall from pants pockets or become exposed to plain view in a clothes hamper.

Mr. Vasquez, who is charged with heroin distribution offenses, has moved to suppress the evidence found in the apartment, as well as statements he made that day, on the ground that the officers violated the Fourth Amendment's "knock-and-announce" rule before forcibly entering his home. His motion requires me to decide whether the officers waited an adequate amount of time before breaking into his home to comply with the rule, and if not, whether suppression is the proper remedy for the violation.

After considering the evidence introduced at a two-day hearing, I find that the police did not wait long enough to give Mr. Vasquez an opportunity to come to the door and thus violated the knock-and-announce rule. Further, in the absence of an applicable Second Circuit precedent, I adopt the reasoning of the D.C. Circuit in *United States v. Weaver*, 808 F.3d 26 (D.C. Cir. 2015), as to why the exclusionary rule should apply to a knock-and-announce violation

1

committed while executing an *arrest* warrant at a suspect's home, even though it does not apply to one committed while executing a *search* warrant at the home under *Michigan v. Hudson*, 547 U.S. 586 (2006).  I therefore find that the unlawful entry into Mr. Vasquez's home calls for suppression of the evidence obtained during execution of the warrant, including statements he made at the home.  I do not find, however, that it calls for the suppression of the separate admission made later by Mr. Vasquez at the command post during booking.  I therefore GRANT in part and DENY in part Mr. Vasquez's motion to suppress (ECF No. 44).

**I.**     **Findings of Fact**

At the evidentiary hearing, the government called Connecticut State Police Detective Christopher Walsh, Connecticut State Police Sergeant Charles Burns, and Drug Enforcement Agency (DEA) Supervisory Special Agent John Rubinstein as witnesses.  Mr. Vasquez called his wife, Elizabeth Vasquez, as a witness.  Based on the parties' evidentiary presentations, I make the following findings of fact.

**A. Events Before Knock and Announcement**

Early in the morning on July 15, 2015, officers from the Connecticut State Police and the DEA gathered to execute a series of approximately 19 warrants relating to alleged drug trafficking crimes.  (Hr'g Tr. Vol. I[1] at 15–19.)  One of the warrants called for the arrest of Jose Vasquez, who was known to reside at 100-102 Washington Street in West Haven, Connecticut. (*Id.* at 150–52.)  Detective Walsh, Sergeant Burns, and Special Agent Rubinstein were assigned to a team responsible for executing Mr. Vasquez's arrest warrant.  (*Id.* at 12, 18.)  During the pre-execution briefing, the officers discussed the manner in which they would enter Mr. Vasquez's residence.  (*Id.* at 102.)  The officers had no specific information that Mr. Vasquez

---

[1] Volume One of the hearing transcript is attached to this ruling as Exhibit A, and Volume Two is attached as Exhibit B.

possessed or used weapons, that there would likely be weapons inside Mr. Vasquez's residence,

or that Mr. Vasquez was a dangerous person.  Detective Walsh's testified that he "believed" he

received information about "particular concerns" about the group of 19 individuals to be

arrested, but identified no such information other than a general association between drug crimes

and firearms:

> Q:  And was there any part of the briefing in which either the DEA personnel
>     advised you and the other people present about any particular concerns or
>     steps you should take in approaching any of the suspects that you might be
>     having to execute process on?
>
> A:  I believe they did.  The particulars, I'm not sure.  But basically at the end of
>     the day that anyone involved in this type of organization we look at as a
>     dangerous person.  Just through training and experience, the connection with
>     firearms is always there.  So regardless of the past or what they said, we
>     would consider these persons as possibly dangerous.
>
> Q:  And is that your practice customarily when you're doing state warrants for the
>     State Police?
>
> A:  It is.
>
> Q:  In a drug case, large scale drug trafficking organization?
>
> A:  That's correct.
>
> THE COURT: Can I just follow-up with one question? . . . At this briefing, did
>     you receive any specific information about [Vasquez] in that regard?
>
> THE WITNESS: I may have, Your Honor.  I just don't recall.
>
> THE COURT: So as you sit here, you don't know?
>
> THE WITNESS: That's correct.
>
> . . .
>
> A:  . . . And there was also some of [other warrant targets] who did have violence
>     in their past, their past police records, et cetera.  However, I don't know which
>     ones did and which ones didn't.

Q: But you're clear I think in saying that you were not given, as the Judge asked you, specific information that Mr. Vasquez was known to carry a weapon, for example, or was known to have engaged in gun play or something in the past?

A: That's correct.

Q: So any concern that you would have with him was really based on your general experience with these cases?

A: That's correct.

(*Id.* at 17–18, 22.) Sergeant Burns repeated this assertion on cross-examination:

Q: And as you said earlier, you don't recall there being anything specific about him being dangerous or having a propensity to use guns or anything like that?

A: Correct.

Q: It's just your general training that sometimes there are guns even when we don't expect it?

A: Yes, sir, tool of the trade.

(*Id.* at 72.) Nor did the officers receive specific information suggesting that they should anticipate to find narcotics in Mr. Vasquez's residence:

Q: Going into the apartment that day, other than what you had heard generally about the investigation, there was no indication that Mr. Vasquez was going to have a large quantity of drugs with him, is that right?

A: I expect nothing and anticipate everything.

. . .

Q: In your experience . . ., you've done buy/bust cases, correct?

A: Yes.

Q: Where a transaction occurs and you go in immediately to see what's there, right?

A: Not a lot.  That's not a level that we deal with.

. . .

Q: With Mr. Vasquez, is that what had happened before this?

A: No.

Q: No one had made a delivery, as far as you knew, right before you crashed the door in, right?

A: Not to my knowledge, no.

(*Id.* at 183–84.)

    100-102 Washington Street is a three-story, multi-family dwelling containing three full-story apartments.  (*Id.* at 152.)  The officers arrived at the residence around 5:45 a.m.  (*Id.* at 76.)  Upon arriving at the building, the officers split into groups, each approaching one of the multiple entrances to the building.  (*Id.* at 103.)  One group entered the building through an unlocked side door,[2] which led to a common hallway and stairwell.  (*Id.*)  That group consisted of somewhere between three to ten officers.[3]  One officer carried a battering ram, and another carried a crowbar.  (*See id.* at 106.)

    The officers had information that Mr. Vasquez lived on one of the upper levels of the building.  (*Id.* at 27–28.)  After they reached the second floor, it became clear to the officers that the second floor unit was vacant: a hole in the second floor unit door where a deadbolt normally would be provided the officers with a clear view into the empty apartment.  (*Id.* at 28.)  The

---

[2] The officers' testimonies were contradictory on this point.  Contrary to Sergeant Burns's assertion that the main group entered through an open side door, Detective Walsh testified that they entered through the front door.  (*Id.* at 24.)  I need not resolve this discrepancy.

[3] According to Detective Walsh, three or four officers were in the group that entered the unlocked door.  (*Id.* at 32–33 ("Q: So who was on the landing or maybe on the stairs a little bit?  Who was out there?  A: It was me, Sergeant Chuck Burns, Detective Chapman, and myself.  THE COURT: Three people?  THE WITNESS: I believe so, Your Honor.  There may have been somebody else.  I would have to refer to the report.").)  According to Sergeant Burns, that group consisted of eight to ten officers.  (*Id.* at 129–30 ("Q: . . . What's your memory as to how many there were?  A: I don't remember, but there were people in front of me and there were people behind me.  Q: Maybe ten?  A: Eight to ten.").)

officers then climbed the stairs further, which led them to a landing in front of the closed and locked third floor apartment door. (*Id.* at 28–29.)

Preparing to knock on the door of the third floor unit, the officers stood in a single-file "stack." (*Id.* at 29.) The officers did not say anything to one another before knocking on the door. (*Id.* at 30.) Sergeant Burns was located towards the middle of the stack, (*id.* at 129), and Detective Walsh was located towards the front (*see id.* at 30). Special Agent Rubinstein was outside of the building at the time. (*Id.* at 33.) After confirming with a United States Marshal that Vasquez resided in the third floor unit (*id.* at 32), Detective Walsh banged loudly on the door with the side of his closed fist and yelled that the State Police were present with an arrest warrant (*id.* at 34–35).[4]

### B.  Events After Knock and Announcement

#### i.   The Officers' Wait Time

The testimony presented by the parties conflicted with regard to the amount of time that elapsed between Detective Walsh's knock and the officers' entry into the apartment. Because I find Ms. Vasquez's testimony more credible than Detective Walsh's testimony on this issue of fact, I find that fewer than ten seconds elapsed between Detective Walsh's knock and the officers' breach.

Ms. Vasquez testified to the following. In July of 2015, Ms. Vasquez lived in Reading, Pennsylvania, but visited Mr. Vasquez in Connecticut periodically. (Hr'g Tr. Vol. II at 202–03.)

---

[4] Detective Walsh's testimony, in which he asserted that he announced the officers' identity and purpose prior to breaching the door, conflicted with Ms. Vasquez's testimony, in which she asserted that the officers did not announce their identity and purpose until after the breach. On this point, I find Ms. Vasquez's testimony not to be credible. In an affidavit signed by Ms. Vasquez and submitted in support of this motion to suppress, Ms. Vasquez attested that the officers announced their identity and purpose before knocking on and breaching the door. (*See* ECF No. 45, at ¶ 7 ("I heard shouts of "DEA! DEA SEARCH WARRANT!!!!" They banged on doors two times, breaking through and into the apartment."); *see also* Hr'g Tr. Vol. II at 269–72 (discussing discrepancy between Ms. Vasquez's testimony and her averment in the affidavit on this fact).)

Ms. Vasquez drove to West Haven on July 13, 2015, to stay with Mr. Vasquez.  (*Id.* at 246.)  She

brought her three dogs.  (*Id.* at 210.)  Prior to this trip, the two stayed at a hotel when Ms.

Vasquez visited, but on this occasion they stayed in Mr. Vasquez's apartment at 100-102

Washington Street.  (*Id.* at 247, 249.)  The bedroom in which the two slept contained only an air

mattress, a television, and a laundry basket filled with folded clothes that Ms. Vasquez had

brought from Reading.  (*Id.* at 218–19.)  In the evening, the dogs slept in the bed with Mr. and

Ms. Vasquez.  (*Id.* at 213–14.)  Ms. Vazquez testified that the dogs agitate easily and bark often.

(*Id.* at 213, 218, 305.)

     In the early morning of July 15, Ms. Vasquez got up from the air mattress, turned off the

window air conditioner in the bedroom, and went to the bathroom.  (*Id.* at 214–16.)  After

returning to bed, she "dozed off."  (*Id.*)  At some point soon after, Ms. Vasquez, not yet in a

"deep sleep," heard a loud bang on the apartment door.  (*Id.* at 216.)  The dogs began to bark.

(*Id.* at 218.)  A second bang came soon after, and police officers were suddenly in the apartment,

yelling, "DEA, search warrant."  (*Id.* at 216.)  One of the dogs jumped off of the bed.  (*Id.* at

218.)  The bedroom door was slightly ajar at the time, and the officers quickly entered the

bedroom with guns pointing at Mr. and Ms. Vasquez.  (*Id.* at 217, 220.)  When the officers

entered, Mr. and Ms. Vasquez were still in bed.  (*Id.* at 217–18.)  Although she did not provide a

specific estimate of the time between the knock-and-announce and the breach of the door, the

gist of Ms. Vasquez's testimony was that it was very short – certainly less than ten seconds.  (*Id.*

at 216 ("[R]ight after that I heard another bang and I heard DEA, DEA search warrant.  And they

rushed into the apartment.").)

     Detective Walsh testified to the contrary.  He stated that upon reaching the landing

leading to the third floor apartment door, he heard the sound of "movement" and "commotion"

inside the apartment, and that after he knocked, he continued to hear movement.  (*Id.* at 33–35.)

Detective Walsh took the movement to mean "that somebody inside was either attempting to flee

or destroy or hide evidence" (*id*. at 35), although he did not explain why, before any knock or

announcement was made, he interpreted such sounds in the early morning hours to be a sign of

flight or evidence destruction.  When asked how much time elapsed between the knock and

announce and the breach, Detective Walsh hesitated, and then testified, "I would say maybe --

maybe 10 to 20 seconds."  (*Id.*)  The parties agree that Mr. and Ms. Vasquez were found in bed

when the officers entered the bedroom.

On the issue of how long the officers waited before breaching the apartment door, I find

Ms. Vasquez's testimony more credible than Detective Walsh's testimony.[5]  During his

testimony, Detective Walsh made it clear that he could not recall much of the events surrounding

Mr. Vasquez's warrant execution.  In describing the events of the morning of July 15, 2015, he

failed to provide definite answers to most of the questions asked of him: he could not identify

how many officers were in the group that made the initial breach into the apartment, and when he

tried to estimate, he suggested a number half of what Sergeant Burns stated (*id.* at 32–33, 129),

---

[5] Sergeant Burns also was asked about length of time the officers waited before breaching the door.  When asked "[d]o you recall how long it was between the knock and announce and when the door was forced?" he responded, "[l]ess than a minute" (*id.* at 108), and provided no further elaboration.  I find that this indefinite statement carries little weight because of its general nature, the fact that Sergeant Burns's demeanor during the statement suggested that he was less than confident in his answer, and the fact that his testimony regarding the entry into the apartment appeared to be based mostly on the entry team's general practice rather than the particularities of that morning. (*See, e.g.*, *id.* at 107 ("Q: . . . [D]o you know if the person who knocked, could you tell by listening to it whether the knocking was done with the flashlight or hand or open first or whatever?  A: It would be a loud knock, like a banging."); 108 ("Q: Do you know if they used a ram or pry bar?  A: I would -- I want to say the ram.  Q: Do you remember or do you just -- A: The ram is usually the first attempted tool."); 109 ("Q: And as you entered the apartment, where was the weapon?  A: I don't recall if my weapon was drawn or not.  It would depend upon how far back I am in the stack whether my gun would be out or not.  Q: Can you explain that to the Judge, please.  Were you ever the front guy?  A: Yes.  Q: If you're the front guy, where's your gun?  A: Generally the people in the back would be -- the people in the front would be ultimately like the cover people and then the people in the back would be the arrest people.  So you would be -- the people in the back would be using their hands to facilitate an arrest."); 110 ("Q: When you entered [the bedroom], did you have your gun drawn?  A: At that point I might have.  I don't recall.").)

nor could he recall the size of the landing leading to the apartment door (*id.* at 28), where he was standing before breaching the door (*id.* at 29), whether he or another officer held the door ram or breached the door (*id.* at 33, 36, 72), the layout of the apartment (*id.* at 37), whether there was anything in the apartment besides the people and the furnishings – such as the dogs (*id.* at 38), the approximate distance from the entrance to the bedroom (*id.*), which direction he went upon entering the apartment (*id.*), whether the Vasquez's bedroom door was open or closed (*id.*), what Mr. and Ms. Vasquez were wearing (*id.* at 45), whether he or another officer handcuffed either Mr. or Ms. Vasquez (*id.* at 46), whether he or another officer escorted Mr. Vasquez to the transport vehicle (*id.* at 65–66), what the weather was like (*id.* at 76), what day of the week it was (*id.*), whether it was light or dark outside (*id.* at 77), the layout of the common entrance to the building (*id.* at 89), or whether he left the building to return to the station with other officers or on his own (*id.* at 94).  When presented with a photograph of Ms. Vasquez, Detective Walsh could not identify her (*id.* at 53), and when presented with a photograph of the building at issue, he could not identify it (*id.* at 76).

Detective Walsh's inability to recall the specific details of the warrant execution is not surprising: he testified that he has executed warrants at three-family wood frame houses – the same type of building as Mr. Vasquez's residence – hundreds of times (*id.* at 10), has done 50 to 75 entries since the July 15, 2015 entry (*id.* at 93), and in total, has "knocked down" a "couple thousand" doors (*id.* at 80).  What is surprising – and, in my estimation, not credible – is that he *could* recall the specific amount of time the officers waited between knocking and breaching the door.  Further, Detective Walsh's hesitation, "maybe" qualification, and overall demeanor

suggested that he was not confident in his answer on the lapse of time before breaching the door.[6]

In contrast to Detective Walsh's inability to recall the details of the events of July 15, 2015, Ms. Vasquez provided significantly more texture in her narrative of the events of that morning.[7]  In particular, Ms. Vasquez testified – credibly and at great length – about the presence and involvement of her dogs on the morning at issue.  This testimony went to such detail that I find it credible.  The fact that Detective Walsh made no mention of the three dogs in the apartment particularly suggests that his recollection of that day is less specific and reliable than Ms. Vasquez's.

The fact that Mr. and Ms. Vasquez were still in (or on) their bed when the officers entered their bedroom – a fact the parties do not dispute – also supports Ms. Vasquez's account more than Detective Walsh's.  If the officers had waited more than ten seconds, it is likely that either Mr. or Ms. Vasquez would have gotten out of bed by the time the officers entered the room.  The fact that neither was out of bed when the officers entered the bedroom suggests that the officers waited an insufficient amount of time to allow the occupants of the apartment to answer the door.

I note, however, that Ms. Vasquez was not a flawless witness at the suppression hearing.  Her testimony that she observed an officer search the laundry basket in the bedroom while she

---

[6] Special Agent Rubinstein, who was not present on the third floor landing during the initial entry into the apartment, testified that he drafted the only report describing the events of the morning in question.  (*See, e.g.*, *id.* at 173 ((Special Agent Rubinstein) "Q: So as far as reports that reflect investigative details, how many reports are there? A: One.  Q: And who wrote that?  A: I did.  Q: Did anybody else write it?  A: No.  Q: Now, did you write it while you were at the premises?  A: No.  Q: Where did you write it?  A: At my office.  Q: And when did you write it?  A: Either the day of or immediately – I started it that day and took a day or so to finish it.  Maybe two days to finish it.").)  The report was not introduced into evidence.

[7] Again, this is unsurprising.  In light of his hundreds of arrest executions and thousands of door entries, Detective Walsh in all likelihood considered the events of the morning of July 15, 2015, to be routine.  Surely the same cannot be said for Ms. Vasquez.

was standing in the living room contradicted her affidavit, in which she stated that she "saw [the officers] start to search the basket as they were removing me and my husband from the bedroom."  (ECF No. 45, at ¶ 12.)  Further, Ms. Vasquez testified on direct examination that she was outside of the bedroom and could see the officers search the laundry basket, but on cross-examination, conceded that she could not view the basket from where she was standing, but rather had inferred that the officers were searching the basket based on what she could see.  (*Compare* Hr'g Tr. Vol. II at 233–37 *with id.* at 292–95.)  She also contradicted her statement in her affidavit that the police dog did not leave the living room when she testified at the hearing that an officer brought the dog into the bedroom to identify marijuana found in a closet.  (*Compare* Aff. ¶ 14 *with* Hr'g Tr. Vol. II at 296–97.)  While her contradictory statements on these points hamper her credibility as a witness generally, her inference that the officers were searching the basket was not unreasonable because there were no other items in the bedroom other than the bed and television.[8]

Because I find Ms. Vasquez's testimony more credible on this point, I find that the officers waited fewer than ten seconds after the knock and announcement before breaching the apartment door.

### ii.  Remaining Findings of Fact Regarding Post-Knock Events

Upon breaching and entering the apartment, Detective Walsh turned right, entering a bedroom where Mr. and Ms. Vasquez were sitting on a bed.  (Hr'g Tr. Vol. I at 41.)  Detective

---

[8] I do find, however, that Ms. Vasquez's testimony regarding marijuana found in the bedroom closet was not credible.  On direct examination, she stated that she saw an officer take a bag of marijuana from the bedroom closet and drop it on the floor.  (*Id.* at 231.)  On cross examination, she asserted that she did not know at the moment she observed the officer searching the closet that the bag contained marijuana.  (*Id.* at 301.)  When questioned by the government how she came to know that the bag contained marijuana, Ms. Vasquez offered several explanations, none of which was believable.  (*Id.* at 301–03.)  While the Court may discount Ms. Vasquez's entire testimony by finding that this part of her testimony was untrue, I choose not to do so in light of the credible nature of other portions of her testimony, and the fact that her narrative about the entry was much more specific, detailed, and believable than the officers' testimony.

Walsh pointed his gun at the two in the bed and instructed them to lie on the ground with their

hands raised.  (*Id.* at 42.)  Both complied, and Ms. Vasquez was directed to the adjoining living

room.  (*Id.* at 113.)  After Mr. Vasquez was handcuffed, Sergeant Burns read him his *Miranda*

rights.  (*Id.* at 115.)  Other officers encountered a third individual in another room of the

apartment.  (*Id.* at 45.)  Special Agent Rubinstein entered the apartment at some point soon after

the officers breached the apartment door.  (*Id.* at 49.)

 Inside the bedroom, Mr. Vasquez was dressed only in underwear.  (*Id.* at 115.)  After he

was handcuffed, Detective Walsh asked him which clothes he wanted to wear.  (*Id.* at 50.)  In

response – with his hands cuffed behind his back – Mr. Vasquez silently nodded towards a

laundry basket sitting on the bedroom floor by lifting his head in the basket's direction.  (*Id.*)  On

top of the basket lay a pair of denim pants.  (*Id.*)  To ensure that nothing was inside the pockets

before giving the pants to Mr. Vasquez, Detective Walsh lifted and shook them.  (*Id.* at 51–52.)

Cash and a black bag fell out of the pants and onto the floor.  (*Id.* at 52.)  The black bag had a

drawstring that was not tied shut.  (*Id.* at 55.)  Detective Walsh picked up the bag.  (*Id.* at 57.)

By looking into the opening of the bag, he could see small glassine bags filled with what

appeared to him to be heroin.  (*Id.* at 57.)

 The denim pants proved too large to fit Mr. Vasquez, and the officers would not allow

him to wear a belt because belts are not permitted inside the detention facility.  (*Id.* at 65.)

Special Agent Rubinstein approached the laundry basket to find a more suitable pair of pants.

(*Id.* at 160.)  Standing above the laundry basket, he saw another bag inside the basket with an

open zipper.  (*Id.*)  Inside the bag, he could see cash and a large plastic bag containing what

appeared to him to be heroin.  (*Id.*)  The officers engaged in a field test of the substance, which

indicated that it contained opiates.  (*Id.* at 167.)  When Special Agent Rubinstein asked whom

the heroin belonged to, Mr. Vasquez answered that it was his.  (*Id.* at 170.)  In total, the officers

were in the apartment for approximately 25 minutes.  (*Id.* at 58.)  At no time did any occupant of

the apartment provide consent for the officers to enter or conduct a search.  (*Id.* at 91.)

The officers transported Mr. Vasquez to the command post, where Mr. Vasquez was

again given his *Miranda* rights.  (*Id.* at 171.)  At this point, according to Special Agent

Rubinstein, things had "settled down."  (*Id.*)  Special Agent Rubinstein asked Mr. Vasquez a

series of questions pertaining to Mr. Vasquez's biographical information, such as "name, date of

birth, address, [and] family members."  (*Id.*)  When asked what his occupation was, Mr. Vasquez

responded, "I'm a drug dealer."  (*Id.* at 171–72.)

## II.   **Fourth Amendment Analysis**

### A.  **Legal Standards**

#### i.   **Burden of Proof**

The issue of which party bears the burden of proof is less clear than one might expect.[9]

"It is well established that the burden of production and persuasion generally rest upon the

movant in a suppression hearing.  The movant can shift the burden of persuasion to the

Government and require it to justify its search, however, when the search was conducted without

a warrant."  *United States v. Arboleda*, 633 F.2d 985, 989 (2d Cir. 1980) (citations and internal

quotation marks omitted).  The officers in this case were equipped with an arrest warrant.  In

*Arboleda*, the Second Circuit stated that an arrest warrant has the same effect as a search warrant

---

[9] Neither party discussed the burden issue in the briefs or during the suppression hearing.  During a legal argument after the presentation of evidence in the suppression hearing, Mr. Vasquez's counsel suggested in passing that the government bears the burden.  (*See* Hr'g Tr. Vol. II at 312 ("So I don't think he's one of the agents that was here, *even though it was the Government's burden to prove*." (emphasis added)).  The government did not contest this assertion.  Because case law from this and other circuits suggest that Mr. Vasquez bears at least an initial burden of proof, and because I find that Mr. Vasquez prevails in his motion even if he holds a burden of showing a violation of the knock-and-announce rule, I disregard the government's potential implied waiver of this issue.

when determining whether a search was "conducted without a warrant" for purposes of assigning the evidentiary burden: "if [the officers] had an arrest warrant for [defendant's brother, who was thought to be in defendant's apartment,] this would have the same legal effect as a search warrant in justifying entry into [defendant]'s home to effect the arrest.  *[Defendant] cannot, therefore, rely on the lack of a search warrant to shift the burden to the Government.*"  *Id.* (emphasis added) (citations and footnote omitted).  Other circuits addressing the burden issue in the knock-and-announce context have instructed that a defendant must establish a "prima facie" case that the knock-and-announce rule was violated.  *See, e.g.*, *United States v. Hromada*, 49 F.3d 685, 689 n.7 (11th Cir. 1995) ("The defendant has the burden of establishing a prima facie case that a knock and announce violation has occurred under § 3109[10] and overcoming the presumption of Government's propriety."); *United States v. Schenk*, 983 F.2d 876, 878 (8th Cir. 1993) ("The defendant bears the burden of establishing a prima facie case when asserting a § 3109 claim.").  Of particular note is *United States v. Murrie*, in which the Sixth Circuit reversed a district court's denial of the defendant's suppression motion, stating, "[s]ince we believe that [the defendant] had made a prima facie case by testifying to a sudden and unannounced breaking without compliance with [the knock-and-announce rule], we must hold that the District Judge was in error in failing to place the burden of proof upon the government in weighing the conflict of evidence."  534 F.2d 695, 698 (6th Cir. 1976).  As that court explained,

> Where the issue is the validity of a search without a warrant, the burden is on the government to show that exigent circumstances excused the requirement of a search warrant.  Here, however, it is not the validity of the search per se which is in issue; rather, it is the validity of the physical entry into the premises, which is governed by the same rules whether or not there is a warrant.  Due to the

---

[10] "Section 3109" is a federal statute that permits officers to "break open" a door "if, after notice of his authority and purpose, he is refused admittance."  18 U.S.C. § 3109.  As discussed below, the Fourth Amendment knock-and-announce analysis tracks that under Section 3109, and as a result courts use the case law corresponding to the constitutional and statutory provisions interchangeably.

> presumption of propriety of police conduct, the burden of establishing the illegality of the entry is on the defendant.
>
> This court has previously held that on a motion to suppress evidence the burden of establishing a prima facie case is upon the movant, but that when such a case has been made, the burden of proof shifts to the government.

*Id.* at 697–98 (citations omitted).

These cases beg the question of what amount of evidence is sufficient to satisfy the "prima facie" showing a defendant must make to shift the burden here. The term "prima facie" takes on different meanings in different legal contexts,[11] and the Court has not been able to locate any cases defining the initial burden in this context. Without any further guidance from knock-and-announce case law, and because I find that Mr. Vasquez has proven a knock-and-announce violation even by a preponderance of the evidence (and that the government has failed to rebut that evidence), I assume that the "prima facie" showing Mr. Vasquez must make to shift the burden to the government is one of the preponderance of the evidence.

While Mr. Vasquez must prove by a preponderance of the evidence that the officers violated the knock-and-announce rule, it is the government's burden to establish, by a preponderance of the evidence, any exceptions to the knock-and-announce rule or the exclusionary rule, such as the existence of an exigency warranting deviation from the knock-and-announce rule, or that the officers would have discovered the evidence at issue even if they had complied with the knock-and-announce rule. *See Murrie*, 534 F.2d at 698 ("Clearly where police officers in breaking into a home in the nighttime have violated a constitutional standard,

---

[11] For example, in the context of an ADA claim, the plaintiff must show *by a preponderance of the evidence* that he "was otherwise qualified to perform the essential functions of his job, with our without reasonable accommodation" to satisfy the prima facie case requirement, *McMillian v. City of New York*, 711 F.3d 120, 125 (2d Cir. 2013), but in the context of an ADEA claim, a "plaintiff who is replaced by a significantly younger worker must offer *some evidence* of a defendant's knowledge as to the significant age discrepancy to support a prima facie inference of discriminatory intent." *Bucalo v. Shelter Island Union Free Sch. Dist.*, 691 F.3d 119, 130 (2d Cir. 2012) (emphasis added).

the burden of proof of exigent or exceptional circumstances to justify such a deviation from the

Fourth Amendment is upon those who are seeking the advantage of the exception."); *United

States v. Stokes*, 733 F.3d 438, 444 (2d Cir. 2013) ("The government bears the burden of proving

inevitable discovery by a preponderance of the evidence.").

### ii.   The Knock-and-Announce Rule

Vasquez argues that the officers' entry into his residence violated the Fourth Amendment

and 18 U.S.C. § 3109[12] because the officers failed to comply with the knock-and-announce rule.

The Fourth Amendment's "reasonableness" inquiry includes the consideration of whether

authorities, before entering a home, knock, announce their identity and purpose, and provide an

occupant the opportunity to answer the door.  *See Wilson v. Arkansas*, 514 U.S. 927, 934 (1995)

("Given the longstanding common-law endorsement of the practice of announcement, we have

little doubt that the Framers of the Fourth Amendment thought that the method of an officer's

entry into a dwelling was among the factors to be considered in assessing the reasonableness of a

search or seizure.").  "It is clearly established that, absent exigent circumstances, the Fourth

Amendment requires officers executing a search warrant to knock at the entrance of the premises

to be searched and to announce their presence.  Absent exigency, the police must give an

occupant a reasonable time to reach the door, a time that will vary with the size of the

establishment, perhaps five seconds to open a motel room door, or several minutes to move

through a townhouse."  *Terebesi v. Torreso*, 764 F.3d 217, 241 (2d Cir. 2014) (citation and

internal quotation marks omitted).  The rule applies whether the police are executing a search

warrant or an arrest warrant of a suspect located in a dwelling.  *Wilson*, 514 U.S. at 935

---

[12] Because I conclude that suppression is warranted due to the officers' violation of the Fourth Amendment knock-and-announce rule while possessing only an arrest warrant, I need not address whether the officers also violated Section 3109.

(although "at the time of the framing, the common-law admonition that an officer ought to signify the cause of his coming had not been extended conclusively to the context of felony arrests[,] . . . [t]he common-law principle gradually was applied to cases involving felonies . . ." (citations and internal quotation marks omitted)); *Miller v. United States*, 357 U.S. 301, 309 (1958) (knock-and-announce rule "applies . . . whether the arrest is to be made by virtue of a warrant, or when officers are authorized to make an arrest for a felony without a warrant."). This longstanding common law requirement demands that officers arriving at a residence "signify the cause of his coming, and . . . make request to open doors." *Miller*, 357 U.S. at 308 (internal quotation marks omitted).

The justifications animating the knock-and-announce rule are (1) "protection of life and limb, because an unannounced entry may provoke violence in supposed self-defense by the surprised resident," (2) "protection of property" against destruction caused by forced entry, and (3) protection of "those elements of privacy and dignity that can be destroyed by a sudden entrance. It gives residents the opportunity to prepare themselves for the entry of the police. In other words, it assures the opportunity to collect oneself before answering the door." *Hudson v. Michigan*, 547 U.S. 586, 594 (2006) (citations and internal quotation marks omitted).

If exigent circumstances exist, however, officers may forgo knocking, announcing, and providing an occupant time to answer the door without violating the Fourth Amendment. "In order to justify a 'no-knock' entry, the police must have a reasonable suspicion that knocking and announcing their presence, under the particular circumstances, would be dangerous or futile, or that it would inhibit the effective investigation of the crime by, for example, allowing the destruction of evidence." *Richards v. Wisconsin*, 520 U.S. 385, 394 (1997).[13]  Because the law

---

[13] Officers may also seek a "no-knock" warrant from a magistrate judge, which provides them with judicial authorization to forgo the knock-and-announce requirement altogether when executing the warrant. *See id.* at 396

"treat[s] a post-knock exigency [no] differently from [its] no-knock counterpart," if circumstances creating an exigency arise immediately after the officers' knocking and announcing, the officers need not wait to be refused entry before breaching the door. *United States v. Banks*, 540 U.S. 31, 40 (2003).

This case presents three issues involving the knock-and-announce rule: (1) whether exigent circumstances existed at the time the officers breached Mr. Vasquez's door, (2) if not, whether the officers waited a sufficient amount of time before breaching the door so as to comply with the knock-and-announce rule, and (3) if not, whether suppression of the fruits of that unlawful entry is a proper remedy.

### B.  Discussion

#### i.   Exigent Circumstances

As stated above, the exigent circumstances analysis is objective: an exigency exists if, based on the totality of the circumstances at the time of the breach, an officer reasonably suspects that allowing an occupant of the residence sufficient time to answer the door would result in (1) danger to the officer or others, (2) futility, or (3) inhibition of investigation. *See, e.g.*, *Terebesi*, 764 F.3d at 241.  Based on my factual findings set forth above, I conclude that exigent circumstances did not exist here.

The Second Circuit has identified six factors to consider when determining the existence of exigent circumstances: (1) "the gravity or violent nature of the offense with which the suspect

---

n.7 ("A number of States give magistrate judges the authority to issue 'no-knock' warrants if the officers demonstrate ahead of time a reasonable suspicion that entry without prior announcement will be appropriate in a particular context.  The practice of allowing magistrates to issue no-knock warrants seems entirely reasonable when sufficient cause to do so can be demonstrated ahead of time.  But, as the facts of this case demonstrate, a magistrate's decision not to authorize a no-knock entry should not be interpreted to remove the officers' authority to exercise independent judgment concerning the wisdom of a no-knock entry at the time the warrant is being executed.").  No evidence presented during the hearing suggested that the officers obtained a no-knock warrant with respect to Mr. Vasquez.

is to be charged," (2) "whether the suspect is reasonably believed to be armed," (3) "a clear showing of probable cause to believe that the suspect committed the crime," (4) "strong reason to believe that the suspect is in the premises being entered," (5) "a likelihood that the suspect will escape if not swiftly apprehended," and (6) "the peaceful circumstances of the entry." *Terebesi*, 764 F.3d at 241.  With respect to the first factor, there was no evidence presented at the hearing that Mr. Vasquez was suspected of engaging in violent crimes.  At the time, however, he had been indicted for trafficking in narcotics, which "is a serious crime." *United States v. Fields*, 113 F.3d 313, 323 (2d Cir. 1997) ("Analyzing the facts before in light of [the six exigency factors] it can be seen that . . . bagging a large quantity of cocaine crack is a serious crime . . .").  Second, there was no evidence presented at the hearing that the officers had a basis for a reasonable belief that Mr. Vasquez or any other occupant of the apartment was armed.  Third, although there was no evidence presented at the suppression hearing about the bases for the grand jury's finding of probable cause, I assume without deciding that Mr. Vasquez's indictment, and resulting arrest warrant, provided a "clear showing" of probable cause to believe he had committed the crime of conspiracy to distribute and to possess with intent to distribute heroin.  Fourth, there were strong reasons to believe that Mr. Vasquez was in the apartment, as his vehicle was parked outside the building.  (Hr'g Tr. Vol. I at 25.)  Fifth, there was no evidence presented at the hearing that suggested Mr. Vasquez would escape if not swiftly apprehended – and the early morning hour at which the warrant was executed suggests otherwise.  Finally, while not extremely violent, the manner of entry surely was not "peaceful."  On balance, an examination of these factors is inconclusive in determining whether an exigency existed.  But when the evidence is examined in light of the recognized bases for exigency in this context – danger, futility, and inhibition of

investigation – it becomes clear that no exigency existed at the time the officers breached Mr. Vasquez's door.

With respect to a risk of danger, the officers were not aware of any information suggesting that Mr. Vasquez or the occupants of the apartment were armed or dangerous other than a generalized concern that those involved in dealing narcotics often have access to guns. For example, the officers were never told that Vasquez owned a gun, carried guns with him, or used guns when trafficking heroin.  *Cf. United States v. Fields*, 113 F.3d 313, 323 (2d Cir. 1997) (holding suspicion of danger reasonable in part because of the defendant's "known potential for violence").  By itself, the generalization just mentioned – that those trafficking in narcotics often equip themselves with deadly weapons – cannot serve as the basis for a reasonable suspicion that knocking and announcing will risk endangering those in the area under the Supreme Court's decision in *Richards*.  In that case, the Court invalidated a state rule permitting officers to forgo knocking and announcing when executing any search warrant in a felony drug case.  520 U.S. at 394 ("[T]he fact that felony drug investigations may frequently present circumstances warranting a no-knock entry cannot remove from the neutral scrutiny of a reviewing court the reasonableness of the police decision not to knock and announce in a particular case.").  Further, there was no reason to believe that knocking, announcing, and providing the occupants of Mr. Vasquez's apartment sufficient time to answer the door would have been futile.  Based on the evidence presented, the officers who breached the door knew essentially nothing about Mr. Vasquez (or any other occupants of the apartment) other than the fact that he lived there.  (*See, e.g.*, Hr'g Tr. Vol. I at 72 (Detective Walsh agreeing that he "didn't know Jose Vasquez from anybody until about 5:00 that morning").)

Detective Walsh's testimony that he heard "movement" and "commotion" inside the apartment before and after he knocked on the door could be relevant to both exigencies of danger and inhibition of investigation.  That testimony, however, lacked any sort of detail with regard to the commotion and movement's volume, location, pace, direction, duration, or proximity to the door.[14]  *Compare United States v. Stiver*, 9 F.3d 298, 302 (3d Cir. 1993) (holding suspicion of destruction of evidence reasonable when, after announcing their presence, the officers "heard heavy and hurried footsteps leading away from the door"); *United States v. Bethea*, 387 F. Supp. 969, 971 (D. Conn. 1975) (five-second wait before entry did not violate rule where officers heard "scuffling inside and the movement of footsteps away from the door" following their knock and announcement).  Detective Walsh's only elaboration was that he heard "basically some sort of footsteps" without further characterization, and that he did *not* hear the loading of a firearm, grinding or shredding, the flushing of toilets, or the running of water in a sink.  (Hr'g Tr. Vol. I at 84.)  Further, Detective Walsh acknowledged that other law enforcement officers were covering the apartment's back exit, preventing any attempted flight.  (*Id.* at 84–85.)  Detective Walsh's largely unadorned statement about hearing movement and commotion is not sufficient to form the basis of a reasonably suspicion of exigency, whether it be grounded in dangerousness or inhibition of investigation.

Finally, with respect to inhibition of investigation, this case differs from *Banks*, where the officers were executing a search warrant at the defendant's house on the basis of specific evidence that the defendant was selling cocaine out of his residence.  540 U.S. at 33.  Here, no evidence was presented suggesting that the officers had information that Mr. Vasquez was using

---

[14] As discussed, it is the government's burden to prove exigency.  Without further evidence corroborating or further detailing the "movement" or "commotion" to which Detective Walsh testified, I cannot find an exigency on this basis.

the apartment to sell or stash heroin, or otherwise likely had heroin or any other easily destructible evidence in his apartment.

Because the evidence presented at the hearing does not support a conclusion that the officers reasonably suspected that they or others would be endangered, that compliance with the knock-and-announce rule would be futile, or that evidence would be destroyed if they did not breach the door when they did, I find that there were no exigent circumstances warranting deviation from the knock-and-announce rule.

### ii. Whether the Officers' Wait Time Complied with the Knock-and-Announce Rule

Having concluded that no exigency existed at the time of the warrant execution, I must decide whether the officers' conduct fell within the contours of the knock-and-announce rule. As stated, I find that prior to entering the apartment, Detective Walsh banged on Mr. Vasquez's door with his fist and announced that the State Police were present with an arrest warrant. The officers thus complied with the first two of the three parts of the rule. The remaining question is whether, before entering, the officers provided the "occupant[s] a reasonable amount of time to reach the door." *Terebesi*, 764 F.3d at 241; *see also* 3 Search & Seizure § 6.2(c) (5th ed.) ("As for what constitutes lack of prompt compliance, the correct view is that, absent exigent circumstances, the occupant must be given a reasonable opportunity to come to the door at which entry is being sought.").

The determination of whether officers waited a reasonable amount of time after knocking is a function of the "precise length of time" between the officers knocking and breaching, *United States v. Vozzella*, 124 F.3d 389, 394 (2d Cir. 1997),[15] and the totality of the circumstances

---

[15] In *Vozzella*, the court found no knock-and-announce violation, despite the absence of evidence of the "precise length of time," because the defendant did not raise the knock-and-announce issue until the evidentiary portion of

surrounding the entry, *United States v. Young*, 609 F.3d 348, 353 (4th Cir. 2010) ("The reasonableness of the delay varies with each case and depends on the totality of the circumstances."). Though this analysis is fact-intensive, courts generally have found wait times of more than ten seconds to be reasonable.[16] *See, e.g.*, *United States v. Rodriguez*, 663 F. Supp. 585, 587 (D.D.C. 1987) ("[T]his Court has been unable to uncover any reported cases in this or any other circuit, upholding the legitimacy of a forcible entry when the officers waited less than 10 to 20 seconds."); *United States v. Morris*, 436 F.3d 1045, 1048 (8th Cir. 2006) (holding that, "[o]n the evidence in this record, we are not prepared to conclude that the time required to open the screen door and reach in the inner door, which appeared to be only two seconds, was great enough to support the government's theory of reasonableness," but as for entrance into an inner door, ten seconds was sufficient wait time "given the risk of destruction of evidence usually present in drug trafficking investigations, the relatively modest size of the home that an occupant would have to traverse to answer the door, and the likelihood that occupants would be awake at the time of the search"); *United States v. Bonner*, 874 F.2d 822, 826 (D.C. Cir. 1989) (holding "11 to 12 seconds from the start of their first announcement" sufficient when "officers heard sounds consistent both with refused admittance and destruction of the object of the search," and, "[i]n the absence of th[ose] factors, a few additional seconds' delay would have supported the conclusion that the officers had been refused admittance"); *see also United States v. DeLutis*, 722

---

the suppression hearing was completed, and because there was other evidence that the agents had given the defendant adequate time to answer the door. 124 F.3d at 394.

[16] In deciding the Fourth Amendment question, courts have also looked to case law interpreting 18 U.S.C. § 3109, which codifies the common law knock-and-announce requirement and thus also Fourth Amendment principles. *United States v. Acosta*, 502 F.3d 54, 57 (2d Cir. 2007) ("The Fourth Amendment knock-and-announce principle and § 3109 share the same common law roots, overlap in scope, and protect the same interests."); *United States v. Ramirez*, 523 U.S. 65, 73 (1998) ("If § 3109 codifies the common law in this area, and the common law in turn informs the Fourth Amendment, our decisions in *Wilson* and *Richards* serve as guideposts in construing the statute.").

F.2d 902, 909 (1st Cir. 1983) ("[G]enerally, a wait of 20 seconds is deemed adequate before the officers may force entry.").  Cases in which courts have found wait times of less than ten seconds reasonable are those in which the officers were aware of particular information supporting a belief that narcotics would be inside the premises upon their arrival and that the defendant would seek to destroy it.  *See United States v. Markling*, 7 F.3d 1309, 1318–19 (7th Cir. 1993) (in a case involving a "small" motel room, where "[t]he officers had been told by two women who had just bought cocaine from [defendant] that he was likely to flush the cocaine he had in his room down the toilet," "seven seconds was not an unreasonably short time for the officers to wait before concluding that [defendant] was not going to let them into the room").

I conclude that it was unreasonable to breach the door after only a few-seconds wait subsequent to the officers' knock on Mr. Vasquez's door.  Two circumstances in this case significantly impact this analysis: (1) the execution of the warrant in the early morning hours, and (2) the lack of specific information known to the officers about Mr. Vasquez at the time they arrived at his door.  First, the officers arrived at the apartment sometime before 6:00 a.m.  Apart from Detective Walsh's vague testimony that he heard movement and commotion, the government presented no evidence suggesting that anyone in the apartment was up and about when the officers arrived.  A reasonable officer arriving at a residence so early in the morning would expect occupants to need additional time to get out of bed or at least to put on additional clothing before answering the door.  At that hour of the day, absent clear evidence that the occupants were up and about, it was not reasonable to draw the inference after waiting fewer than ten seconds that the occupants had decided to refuse the officers entry to the apartment.  Relatedly, at that hour, a reasonable officer would not expect an occupant to be awake and ready to dispose of narcotics at a moment's notice.  The privacy interest animating the knock-and-

announce rule is heightened in the context of an early-morning entry, when the occupants are likely sleeping and in night clothes: an occupant, upon waking, would need additional time to "pull on clothes" and "collect" herself before answering the door.  *See, e.g.*, *United States v. Spriggs*, 996 F.2d 320, 323 (D.C. Cir. 1993) (distinguishing that case from an early-morning warrant execution, "when it was not reasonable to assume that the occupants were awake and able to respond promptly").  Even if Detective Walsh did hear footsteps in the apartment at the time the officers approached the door, that fact alone would not have led a reasonable officer to believe that the occupants were attempting to flee or destroy evidence.  Under the circumstances and without further elaboration by Sergeant Burns,[17] hearing "some sort of footsteps" in the apartment was at least as consistent with the inference that an occupant was making an early morning trip to the bathroom as it was with an inference that flight or evidence destruction were occurring.  Indeed, it was more consistent with the former explanation, because Detective Walsh testified that he heard "movement" – apparently the same movement – before and after the knock and announcement.

The other significant circumstance in this case is the lack of specific information the officers had about Mr. Vasquez at the time they knocked on his door.  As noted, the government presented no evidence suggesting that the officers had information that Mr. Vasquez was dangerous or possessed weapons, or that narcotics likely would be found at the residence.  If the officers had probable cause to believe narcotics would be found inside Mr. Vasquez's residence, they could have obtained a search warrant.  (As discussed below, the presence of a search

---

[17] In fact, Sergeant Burns testified that he heard nothing inside the apartment before or after the officers knocked and announced their presence.  (Hr'g Tr. Vol. I at 107 ("Q: And prior to the knock and announcement, do you recall seeing or hearing anything from the hallway -- from the apartment as you were standing in the hallway?  A: No, I do not.  Q: And after the knock and announce, do you recall seeing or hearing anything coming from the apartment?  A: No, I do not.").)  Nonetheless, as discussed above, I do not accord much weight to Sergeant Burns's testimony on this point because his recollection was based mostly on the entry team's general practice, and it appeared – based on his answers and demeanor – that he did not remember the events of July 15, 2015, particularly well.

warrant would by itself have been enough to defeat the motion to suppress in this case.)  "[I]n the case with no reason to suspect an immediate risk of frustration or futility in waiting at all, the reasonable wait time may well be longer when police make a forced entry, since they ought to be more certain the occupant has had time to answer the door."  *Banks*, 540 U.S. at 41.  While it cannot be said that the officers here had *no* reason to believe that heroin might be found in the residence – Mr. Vasquez was, after all, being arrested on a warrant for distributing heroin – considering the extra time the occupants should have been afforded to get out of bed and answer the door, the failure to wait more than ten seconds – and probably 15 or 20 – was unreasonable.

For these reasons, it was necessary for the officers to wait longer than they did before breaching the door.  Thus, the officers failed to comply with the knock-and-announce rule.

### iii.  Remedy

#### a.  Items Found and Statements Made in Mr. Vazquez's Apartment

In *Hudson*, the Supreme Court held that a defendant is not entitled to an order suppressing fruits of a search when law enforcement officers violate the knock-and-announce rule in executing a search warrant.  Mr. Vasquez argues that *Hudson* is not controlling because the officers in this case were acting with only an arrest warrant.  I agree with Mr. Vasquez that *Hudson* does not control the arrest warrant context, and conclude that he is entitled to suppression of the evidence obtained during the July 15, 2015 arrest warrant execution.

The Second Circuit has not ruled on the question of whether *Hudson*'s holding applies to the arrest warrant context.  A split panel of the D.C. Circuit recently held that it did not.  *Weaver*, 808 F.3d at 45 ("[W]e conclude that the exclusionary rule is the appropriate remedy for knock-and-announce violations in the execution of arrest warrants at a person's home.").  Because I

agree substantially with Judge Pillard's reasoning in her opinion for that court, I briefly outline the pertinent portions below.

First, the *Weaver* court distinguished the authority that a search warrant confers to officers from that arising from an arrest warrant:

> An arrest warrant reflects no judicial determination of grounds to search the home; rather, it evidences probable cause to believe that the arrestee has committed a crime, and authorizes his arrest wherever he might be found. . . . Any prerogative an arrest warrant may confer to enter a home is thus narrow and highly contingent on the particular circumstances of the arrest.
>
> An individual subject to an arrest warrant accordingly retains a robust privacy interest in the home's interior.

*Id.* at 30–31.  It then highlighted Justice Kennedy's[18] insistence that suppression would remain appropriate when "the knock-and-announce violation could properly be described as having caused the discovery of evidence, and if so, whether its costs outweigh its benefits."  *Id.* at 31 (quoting *Hudson*, 547 U.S. at 604 (Kennedy, J., concurring)) (internal quotation marks omitted).

The *Weaver* court then addressed whether *Hudson*'s holding applied to the arrest warrant context.  *Hudson* emphasized that "[w]hat the knock-and-announce rule has never protected . . . is one's interest in preventing the government from seeing or taking evidence described in a warrant."  547 U.S. at 594.  This language suggests that the Court was considering the search warrant context only, because "[s]earch warrants—and not arrest warrants—'describe' 'evidence' and authorize officers to 'take' that evidence."  *Weaver*, 808 F.3d at 36.  Because "the arrest warrant context is materially distinguishable from the search warrant context," the court found that *Hudson* did not control.  *Id.* at 36, 37.  Arrest and search warrants requirements "protect distinct privacy interests": search warrants permit officers to enter and rifle through a citizen's "castle," whereas officers equipped only with an arrest warrant may enter the home

---

[18] Justice Kennedy provided the fifth vote in the *Hudson* majority.

only when there is reason to believe the target is in her home *and* she refuses to surrender herself at her door.  *Id.* at 37–39.  In fact, privacy interests would prompt an arrestee to surrender herself at her door in order to "keep private and personal papers and effects in the home, or the fact or identity of a guest, from government agents' view.  The Fourth Amendment's protection of the privacy of personal spaces, documents, and things at home applies whether or not they are evidence of wrongdoing or a potential source of embarrassment."  *Id*. at 39.

Moving to the central question of whether the exclusionary rule should be applied in the arrest warrant context, the *Weaver* court addressed the "[t]wo factors [that] governed [*Hudson*'s] consideration: whether there was a causal link between the violation and the seizure of the evidence and whether the rule's deterrence benefits outweigh[] the costs of excluding probative evidence."  *Id.* at 34.  With respect to causation, the *Hudson* Court had queried whether the knock-and-announce violation was the cause-in-fact of the officers' discovery of the evidence at issue, and whether that causation was too remote to justify exclusion.  The *Weaver* court concluded that, in the arrest warrant context, causation is "clear and strong" because "[a]pplication of the knock-and-announce rule in the arrest warrant context enables the arrestee to protect his privacy at home by surrendering himself at the door."  *Id.* at 42–43.  By failing to provide the occupant an opportunity to do so,

> the officers gain access to more—perhaps a great deal more—of a home's interior than they would have had they fulfilled their constitutional obligation to knock, announce, and allow the arrestee to come to the door. . . . Officers' failure to knock and announce, therefore, can cause them to view areas of the home and discover evidence that they would not otherwise have constitutional authority to see.  In such cases, the constitutional violation is the *direct cause* of law enforcement officers obtaining evidence beyond that which the warrant lawfully authorizes.

*Id.* at 42 (emphasis added).  "Suppressing evidence obtained in violation of the knock-and-announce rule thus directly serves the interests protected by the rule."  *Id.*

It is true – as the *Weaver* court suggested at the conclusion of its opinion – that no causal

link would exist if the officers would have discovered the evidence at issue even if they had

complied with the knock-and-announce rule.  But this proposition does not affect the differences

in the causation analyses between search and arrest warrants.  Rather, it is just a species of the

"inevitable discovery" doctrine, which permits the admission of illegally obtained evidence if the

government proves "that the evidence would have been acquired lawfully through an

independent source absent the government misconduct."  *United States v. Eng*, 997 F.2d 987,

990 (2d Cir. 1993).[19]  To prove this in the context of an arrest warrant execution, the government

would have to show (1) that the defendant would not have answered the door after being given

sufficient time to do so, permitting them to breach the door and enter the apartment, or (2) even

if the defendant had answered the door, the officers would have obtained the same evidence

while performing a search incident to arrest or protective sweep.  *See Weaver*, 808 F.3d at 45

("The government has thus failed to create a record that would enable us to conclude that the

agents would have made the same observations had they knocked, announced, and arrested

Weaver on his threshold.").  Here, the government has made no such showing.  Specifically, the

record does not suggest that had Mr. Vasquez come to the door, and had the officers engaged in a

protective sweep of the surrounding areas, the officers would have come upon the narcotics and

cash that were inside Mr. Vasquez's pants or under the clothing in the hamper.

Moving to the second factor, the *Weaver* court weighed the costs of applying the

exclusionary rule against its benefits.  The applicable costs are those identified in *Hudson*:

---

[19] Arguably, even without *Hudson*'s hard-and-fast rule, in almost every case involving a search warrant, evidence obtained subsequent to a knock-and-announce violation would be nonetheless admissible under the inevitable discovery doctrine.  Officers equipped with a search warrant have authority to search the premises independent of whether they complied with the knock-and-announce rule.  For the reasons explained below, the same cannot be said about cases involving arrest warrants.

judicial resources spent on defendants' knock-and-announce violation claims, overdeterrence

(i.e., future officers waiting too long after knocking out of fear of violating the rule), and the loss

of incriminating evidence at trial.  *Id.* at 43.  These costs are without a doubt substantial.

Nonetheless, the benefits of applying the exclusionary rule, particularly deterrence, carry more

weight.  The law's capacity to deter unconstitutional police practices depends on officers'

incentive to violate the right at issue, which in this context is significant:

> Officers armed with only an arrest warrant—who, for whatever reason, did not
> seek or were unable to obtain a search warrant—have a strong incentive to violate
> the knock-and-announce rule . . . [because e]ntering a home unannounced . . .
> increases the chances [they] will gain entry to part of a home they would not
> otherwise have entered to carry out the arrest, and will thereby give themselves an
> opportunity to find incriminating evidence they otherwise would never see.

*Id.* at 43.  Because the incentive to violate the knock-and-announce rule in the *arrest* warrant

context is powerful, the deterrent effect of exclusion carries significant weight.  "When

application of the exclusionary rule provides beneficial deterrence, and that benefit outweighs

the costs of the rule, it applies."  *Id.* at 34.  Because that is the case in the arrest warrant context,

suppression is appropriate when officers executing an arrest warrant violate the knock-and-

announce rule.

I find *Weaver*'s interpretation of *Hudson* – and its distinction between arrest and search

warrants – to be persuasive, and also consistent with Fourth Amendment principles regarding the

scope of authority conferred by a warrant.  The authority an arrest warrant grants to enter a home

is conditioned on (1) the police's reasonable belief that the suspect is inside, and (2) the

defendant's refusal to come to the door.  *See Payton v. New York*, 445 U.S. 573, 602–03 (1980)

("If there is sufficient evidence of a citizen's participation in a felony to persuade a judicial

officer that his arrest is justified, it is constitutionally reasonable to require him to open his doors

to the officers of the law.").  If the latter condition is not satisfied – or if it is satisfied only

because the police have violated the knock-and-announce rule, another Fourth Amendment protection – then the officers exceed the authorization to enter the home granted by the arrest warrant. *Id.* at 592–93 ("'In all cases when the King is party, the Sheriff (if the doors not be open) may break the party's house . . . . But before he breaks it, he ought to signify the cause of his coming, and to make requests to open doors; . . . . for the law without a default in the owner abhors the destruction or breaking of any house . . .'" (quoting *Semayne's Case*, 77 Eng.Rep. 194, 195–196 (K.B. 1603), and noting that the "context [of the quoted passage] strongly implied . . . that the court was describing *the extent of authority in executing the King's writ*." (emphasis added)). I see no reason to apply the exclusionary rule to such conduct any differently from the way it would apply to any other search or seizure that exceeds the scope of a warrant. *See, e.g.*, *United States v. Matias*, 836 F.2d 744, 747 (2d Cir. 1988) ("[W]hen items outside the scope of a valid warrant are seized, the normal remedy is suppression and return of those items . . ."). As *Hudson* recognized, the same logic does not apply to a search warrant because the authorization to enter a home that such a warrant provides is not conditioned on compliance with the knock-and-announce rule or on an occupant's refusal to come to the door; rather, it is based independently on probable cause that evidence of a crime will be found inside.

I disagree with Judge Henderson's assertion in her dissent in *Weaver* that the vast majority of circuits have applied *Hudson* to the arrest warrant context. As the *Weaver* majority notes, only two cases from Judge Henderson's list – both from the same circuit – expressly state that *Hudson* applies to the arrest warrant context. But in neither of those two cases did the defendant raise, nor did the court discuss, the differences in causation analysis between search and arrest warrants. In *United States v. Pelletier*, 469 F.3d 194 (1st Cir. 2006), a defendant challenged the search of his motel room when the police breached the door after waiting ten to

fifteen seconds.  Despite the court's statement at the opening section of its opinion that, "[t]his appeal requires us to determine whether *Hudson* should be extended to a knock and announce violation committed in the course of executing an arrest warrant," *id.* at 196, the opinion fails to analyze that issue in any depth.  Rather, it rejects the defendant's contention that the officers lacked authority to enter his room, and then states, without further elaboration, "[b]ecause *Hudson* applies with equal force in the context of an arrest warrant, the district court did not err in refusing to order suppression based upon the officers' conceded violation of the knock and announce rule."  *Id.* at 201.  In *United States v. Jones*, 523 F.3d 31 (1st Cir. 2008), the court repeated the same proposition without any analysis: "we have recognized the absence of an exclusionary rule for knock-and-announce violations, provided the police have a valid arrest warrant . . ."  *Id.* at 36 (citing *Pelletier*, 469 F.3d at 199).  In neither case did the court grapple with the causation analyses discussed above.  *See Weaver*, 808 F.3d at 41 ("Because we believe those distinctions are material to *Hudson*'s analysis, the First Circuit's failure to acknowledge them undercuts those decisions' persuasive force.").

   In sum, I find the *Weaver* court's analysis compelling, and agree that when officers equipped with an arrest warrant violate the knock-and-announce rule, the defendant is entitled to suppression of the fruits of that unlawful entry of his home.  Because Mr. Vasquez proved (and the government failed to rebut) that the officers violated the knock-and-announce rule when executing Mr. Vasquez's arrest warrant, I grant his motion to suppress the narcotics and money found in his apartment on the morning of July 15, 2015, as well as the statement he made about those narcotics while in the apartment.

### b.  Mr. Vasquez's Statement at the Command Post

Mr. Vasquez's statement to Special Agent Rubinstein at the command post, in which he said that his occupation was "drug dealer," however, stands on a different footing.  Mr. Vasquez's suppression motion and supporting brief make a general assertion that "any statements made" to the officers involved in this case should be suppressed.  Although the suppression hearing did not focus on the question of whether the statement made at the command post should be suppressed, I find it should not be.

The Supreme Court has held that unlawful entries into a home in violation of the Fourth Amendment cannot serve as the basis for suppressing a statement made later at a stationhouse when there was probable cause to arrest the individual.  In *New York v. Harris*, officers unlawfully entered the defendant's home – with probable cause but without consent or a warrant – to arrest the defendant in connection with a murder.  495 U.S. 14, 17 (1990).  While the police were in his house during the warrantless entry, the defendant made incriminating statements in response to their questions.  After the officers brought the defendant to the station, the defendant agreed to draft a written confession.  *Id.* at 16.  At trial, the defendant sought to suppress the written confession on the grounds that it was fruit of the unlawful entry into his home.  The trial court suppressed the statements made in the home but not the written confession made at the police station.  In the Supreme Court, the defendant argued that the stationhouse confession had to be suppressed as well.  The Supreme Court disagreed, stating that the exclusionary rule did not extend that far: "we decline to apply the exclusionary rule in this context because the rule in *Payton* [requiring an arrest warrant to enter a house to effect an arrest] was designed to protect the physical integrity of the home; it was not intended to grant criminal suspects, like Harris, protection for statements made outside their premises where the police have probable cause to arrest the suspect for committing a crime. . . .  Because the officers had probable cause to arrest

Harris for a crime, Harris was not unlawfully in custody when he was removed to the station house, given *Miranda* warnings,[20] and allowed to talk." *Id.* at 17–18.  The Court distinguished this scenario from that in which officers lack probable cause when they arrest the defendant:

> In each of those cases, evidence obtained from a criminal defendant following arrest was suppressed because the police lacked probable cause.  The three cases stand for the familiar proposition that the indirect fruits of an illegal search or arrest should be suppressed when they bear a sufficiently close relationship to the underlying illegality.  We have emphasized, however, that attenuation analysis is only appropriate where, as a threshold matter, courts determine that the challenged evidence is *in some sense the product of illegal governmental activity.*
> . . .
>
> Harris' statement taken at the police station was not the product of being in unlawful custody.  Neither was it the fruit of having been arrested in the home rather than someplace else.

*Id.* at 19 (citations omitted) (emphasis added).  The officers had a warrant to arrest Mr. Vasquez before bringing him to the command post, and Mr. Vasquez has not contested that the warrant was supported by probable cause.  Thus, his statement made while at the command post cannot be suppressed on the basis that the officers had earlier unlawfully entered his home while executing his arrest warrant.  Thus, I deny his motion to the extent it seeks to suppress that statement.

*          *          *

---

[20] In this case, the government presented uncontradicted evidence that Mr. Vasquez was Mirandized twice before Mr. Vasquez made the statement at the command post: first, at his apartment (Hr'g Tr. Vol. I at 114), and second, before Special Agent Rubinstein questioned him at the command post (*id.* at 171).  In any event, even if he were not Mirandized, the statement would not implicate the Fifth Amendment.  A defendant's right against self-incrimination does not extend to answers to biographical questions during booking, such as how the defendant is employed. *Pennsylvania v. Muniz*, 496 U.S. 582, 601–02 (1990) ("Muniz's answers to these seven questions are nonetheless admissible because the questions fall within a routine booking question exception which exempts from *Miranda*'s coverage questions to secure the biographical data necessary to complete booking or pretrial services." (internal quotation marks omitted)); *United States v. Chandler*, No. 15-CR-131 (ADS), 2016 WL 614679, at *16 (E.D.N.Y. Feb. 12, 2016) ("Routine booking questions are those designed to elicit an arrestee's pedigree, such as the arrestee's name, aliases, date of birth, address, place of employment, and marital status.").

I recognize that application of the exclusionary rule imposes a burden on law enforcement officers.  In the chaotic atmosphere of executing an arrest warrant, officers are understandably focused more on securing the scene than checking their wristwatches to ensure they have waited a sufficient amount of time before breaching an entrance.  Yet the courts must ensure that the legal consequences of constitutional violations operate as a proper and adequate deterrent.

Further, I emphasize that the determinative circumstances in this case were not the result of decisions made in the heat of the moment.  Rather, they were the result of decisions made either prior to the warrant execution or after Mr. Vasquez was detained: the officers chose to execute the warrant early in the morning, chose not to obtain – or were denied – a search warrant or a "no-knock" warrant, and chose not to document the amount of time they waited before breaching the door.  As to that last circumstance, had the officers documented the length of time that they waited after knocking and announcing their presence – and had that documentation supported Detective Walsh's testimony that they waited more than ten seconds – the government's evidentiary presentation would have carried more weight, particularly given Detective Walsh's weak memory of the incident during the hearing.

Based on the evidence presented at the suppression hearing, I conclude the officers failed to provide Mr. Vasquez a reasonable opportunity to surrender himself at his apartment door.  And because that failure calls for application of the exclusionary rule for the reasons indicated, the evidence the officers obtained inside the apartment cannot be used at trial.  Mr. Vasquez's statement made at the command post, however, may be offered.

**III.    Conclusion**

Mr. Vasquez's motion to suppress is GRANTED in part and DENIED in part.

IT IS SO ORDERED.

_____/s/_____
Michael P. Shea, U.S.D.J.


Dated:        Hartford, Connecticut

              June 2, 2016